Tina Wolfson (SBN 174806)
twolfson@ahdootwolfson.com
Robert R. Ahdoot (SBN 172098)
rahdoot@ahdootwolfson.com
Christopher E. Stiner (SBN 276033)
cstiner@ahdootwolfson.com
Lisa Cintron (SBN 356009)
lcintron@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
2600 W. Olive Ave., Suite 500
Burbank, California 91505
(310) 474-9111 (telephone)
(310) 474-8585 (facsimile)

Carter E. Greenbaum (SBN 344692)
carter@greenbaumolbrantz.com
**GREENBAUM OLBRANTZ LLP**
160 Newport Center Drive, Suite 110
Newport Beach, CA 92660
Tel: (332) 222-9119

*Counsel for Plaintiff and the Proposed Class*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# SOUTHERN DIVISION

| | |
|---|---|
| MARC BRENMAN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>KIA AMERICA, INC.,<br><br>Defendant. | Case No. 8:26-cv-1428<br><br>**CLASS ACTION COMPLAINT**<br><br>**ACTION SEEKING STATEWIDE OR NATIONWIDE RELIEF**<br><br>**JURY TRIAL DEMANDED**<br><br>1. Violations of the Maryland Consumer Protection Act, Md. Code Com. Law § 13-101, *et seq.*<br>2. Fraud/Fraudulent Omission<br>3. Breach of Express Warranty<br>4. Breach of Implied Warranty<br>5. Unjust Enrichment |

CLASS ACTION COMPLAINT

Plaintiff Marc Brenman ("Plaintiff"), by and through counsel, brings this Class Action Complaint against Defendant Kia of America, Inc. ("Defendant" or "Kia") on behalf of himself and all others similarly situated. Plaintiff alleges, upon personal knowledge as to his own actions and his counsel's investigations, and upon information and belief as to all other matters, as follows:

## NATURE OF THE CASE

1.      Plaintiff brings this action on behalf of himself and a class of current and former purchasers and lessees of Kia Tellurides model years 2020-2026 ("Vehicles" or "Class Vehicles"). In short, these Vehicles suffer from a defect that causes the battery power to drain while the Vehicle is turned off and causes electrical system and safety features to malfunction even while the Vehicle is turned on (the "Parasitic Drain Defect" or "Defect").

2.      Vehicles plagued by the Defect leave drivers and their passengers stranded as the Vehicle will not start absent an outside power source. The Defect presents a serious safety hazard for drivers and passengers who are stranded by an inoperable Vehicle, where the engine stalls, or where the Vehicle's speedometer, alternator or power-steering is affected by uneven power supplies while driving.

3.      The defect manifests through one or more electrical system components failing to properly enter sleep mode or otherwise creating excessive parasitic draw on the electrical supply. One source of the Defect is the result of a failure of the Electronic Control Module ("ECM"), the component that regulates the flow of electricity between the battery and other vehicle components requiring power, such as the alternator, power-steering, and radio. A properly functioning ECM prevents excessive drainage of charge from the battery to other vehicle components. In the Class Vehicles, the ECM, along with other components of the electrical system, fail to prevent this excessive drainage, causing a "parasitic drain" on the battery while the Vehicle is turned off and causing power surges or uneven power supplies while driving.

4.      The Parasitic Drain Defect occurs during normal use and operation of the

1

Vehicles.

5. Since approximately 2019, Kia designed, manufactured, marketed, sold, and leased to Plaintiff Brenman and Class members Class Vehicles equipped with the Defect, resulting in parasitic drain.

6. Kia's marketing aims to convince consumers that the Class Vehicles are safe and dependable and represents that the batteries should last three to five years. But Kia has misrepresented and actively concealed the existence, causes, and consequences of the Parasitic Drain Defect, which results in the failure of the Vehicles' essential purpose: to transport drivers and passengers reliably and safely.

7. For example, Class Vehicles sold at Kia dealerships are each sold with window stickers (i.e., the sheets/stickers displayed in the Class Vehicle windows at dealerships), dealership literature, warranty information booklet, and owner's manual, but disclose nothing about the Defect. The window stickers for the Class Vehicles advertise electronic features and the warranty information booklet discusses the battery, but neither mentions the Defect. Each would have been an appropriate location to identify the Defect, but Kia failed to do so.

8. The Parasitic Drain Defect causes the Vehicles to fail in their most indispensable use, that is, to reliably start the engine.

9. The Defect also causes serious safety concerns. Unexpected battery failure leaves drivers and passengers stranded long before approaching the end of the battery's three-to-five-year life cycle. The Defect can also result in the engine stalling or failure of essential safety components, such as the speedometer, hazard lights, and/or power-steering. In addition to the safety issues, the Defect can result in costly battery replacements as well as out-of-pocket costs for things like towing, roadside assistance, and portable battery chargers.

10. As evidenced by the complaints of Plaintiff Brenman and other Vehicle owners that have been filed with the National Highway Traffic Safety Administration ("NHTSA"), the Defect arises unexpectedly and presents ongoing safety concerns and

CLASS ACTION COMPLAINT

challenges.

11.    Based upon the NHTSA complaints, Defendant has been on notice of the Defect and resulting safety concerns since at least 2021.

12.    Kia's pre-release testing was substantially certain to detect the Parasitic Drain Defect as early as 2019. The Defect can manifest quickly, within months or days of purchase. Further, the Defect is easily detectible through common pre-sale tests measuring the rate of electrical drainage from the battery.

13.    Yet, Defendant has done little, if anything, to resolve this glaring safety concern. Nor has Defendant recalled the Vehicles or announced the Defect to the public or its customers. Defendant and its authorized dealerships do not forewarn purchasers despite their knowledge of the Defect. To the contrary, Defendant has done everything in its power to suppress the Defect.

14.    Defendant's efforts to conceal the Defect continue. When Plaintiff Brenman and Class members experience the effects of the Parasitic Drain Defect and present their Vehicles to Defendant's authorized repair centers, Defendant fails to acknowledge the existence of the Defect, and makes no attempt to repair it.

15.    Accordingly, this action is brought to rectify Defendant's misconduct, including Defendant's conscious effort to conceal material facts concerning the Parasitic Drain Defect during and after the design, distribution, marketing, and sale and/or lease of the Vehicles.

## PARTIES

### Plaintiff Marc Brenman

16.    Plaintiff Brenman is an adult resident of Maryland and California. On June 14, 2021, Plaintiff Brenman purchased a 2021 Kia Telluride certified preowned from Herson's Kia, an authorized Kia dealership located in Rockville, Maryland. The odometer indicated the Vehicle had 4,824 miles. The Vehicle came with a 5-year/60,000 mile New Vehicle Limited Warranty, a 10-year/100,000 mile Powertrain Limited Warranty, and a 12-month/12,000 mile Platinum Limited Warranty. Plaintiff Brenman

CLASS ACTION COMPLAINT

uses the Vehicle for personal and household purposes.

17.     This Vehicle was designed, manufactured, sold, distributed, advertised, marketed, and/or warranted by Defendant.

18.     The Vehicle's safety and reliability were important factors in Plaintiff's decision to purchase his Vehicle. Before making his purchase, Plaintiff researched the details about the Vehicle by reviewing Kia's corporate website and the website hosted by his dealership at the time. He also reviewed the window sticker, spoke to a representative of the authorized Kia dealership who assured him of the quality, safety, and reliability of the Vehicle, and test drove the Vehicle he ultimately purchased. Plaintiff selected and ultimately purchased his Class Vehicle because the vehicle was represented to be and was marketed as a high-quality vehicle capable of providing safe, reliable transportation.  The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components.

19.     Starting in approximately the fall of 2025, Plaintiff Brenman began receiving a message on his dashboard indicating that the "battery is discharging to an external device." Plaintiff Brenman replaced the battery. Nevertheless, the problem persisted. In one incident, Plaintiff Brenman left his Vehicle parked with all user-operated functions turned off (*e.g.*, the headlights, cabin lights). Hours later, Plaintiff Brenman approached his Vehicle and was unable to unlock the Vehicle with the key fob. Plaintiff Brenman had to manually unlock the door to raise the hood, cutting his hand in the process. Thereafter, the Vehicle would not start. The battery was completely out of power. No external device was connected to the Vehicle during this period. This was a high-quality AAA battery that was installed two months earlier—well within the normal lifecycle of the battery.  The Vehicle had fewer than 33,416 miles on the odometer. In order to restart the Vehicle, Plaintiff Brenman had to jump start the battery with an external power source.

20.     On December 3, 2025, Plaintiff Brenman brought the Vehicle to Herson's Kia because even the new battery was repeatedly dying. The mechanic conducted a

CLASS ACTION COMPLAINT

performance diagnostic and found the battery, alternator, starter, drive belts, and terminals "in good condition." Plaintiff Brenman was charged $184.49 for the labor and $44.96 in other fees for the service. The dealership never determined the reason for the battery drain, let alone resolved the issue.

21.     At the time he purchased the Vehicle, Plaintiff Brenman did not know that the Vehicle contained an unsafe Defect and that as a result he would not be able to safely and reliably access and drive the Vehicle. Plaintiff Brenman relied upon Kia's statements regarding the safety and reliability of the Vehicle. However, Kia failed to disclose material facts related to the Vehicle's purpose. Additionally, the Defect significantly diminishes the value of Plaintiff Brenman's Vehicle. As a result, Plaintiff Brenman received less than what he paid for the Vehicle and did not receive the benefit of the bargain. Had Kia disclosed the Defect on its website, through its dealership, in its warranty manual, or elsewhere prior to purchasing the Vehicle, Plaintiff Brenman would not have purchased the Vehicle, or would have paid a lesser amount for the Vehicle.

**Defendant Kia America, Inc.**

22.     Kia America, Inc., is a California corporation, organized, in existence, and registered to do business in California under California law, with its corporate headquarters located at 111 Peters Canyon Road Irvine, California, 92606.

23.     Kia markets, sells, and leases the Class Vehicles throughout the United States, including in this District. Kia is responsible for sales, marketing, service, distribution, import, and export of Kia-branded products, including vehicles and parts, in California, and in the United States. Kia is also the warrantor and distributor of Kia vehicles, including the Vehicles in California, Maryland, and throughout the United States.

24.     Kia has thousands of authorized dealerships across the United States— which are its agents—and controls the distribution of automobiles, parts, and services, and warranty repairs Kia vehicles throughout the United States, all of which are under Kia's control. Kia authorizes these distributors and dealerships to sell Kia vehicles, parts,

CLASS ACTION COMPLAINT

and accessories and to service and repair Kia vehicles using Kia parts. Kia exerts control over its dealership-agents through the technical service bulletins and other repair guidance it issues to its dealerships relating to problems arising with Kia vehicles, including the Defect in the Vehicles, and instructing dealerships how to perform repairs; Kia's warranty directs Vehicle owners and lessees to present their Vehicles to Authorized Kia Dealers for repairs and service; and Kia requires authorized dealerships to submit detailed data to it regarding repairs performed at dealerships.

25.     Kia does substantial business in California, with a significant portion of the sales and leases made in California. In fact, most of its work in sales, marketing, distribution, import, export, and warranty of Kia-branded products, including vehicles and parts, takes place in California.

26.     California hosts a significant portion of Kia's U.S. operations, including sales and service offices and financial service offices, among others. Kia's research and design facilities are in California.

27.     In addition, the conduct that forms the basis for each and every Class member's claims against Defendant emanated from Kia's headquarters in California and is consistent with directives of Defendant's personnel in California.

## JURISDICTION AND VENUE

28.     The Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2), because the proposed class has more than 100 members, the class contains at least one member of diverse citizenship from Defendant, and the amount in controversy exceeds $5 million.

29.     The Court has personal jurisdiction over Defendant because Defendant is headquartered and conducts substantial business in California, generally, and in this District, specifically. Defendant has advertised, marketed, promoted, distributed, and sold the Vehicles in California.

30.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events and omissions giving rise to this action occurred in this

6

CLASS ACTION COMPLAINT

District as the Defect in Plaintiff's Vehicle was designed and marketing from Defendant's headquarters in this District and because the Defect has manifested itself within this District.

31.     To the extent there is any contractual or other impediment to pursuit of these claims on a class action basis, Plaintiff specifically alleges, and will prove, if necessary, that any bar to class action proceedings is unconscionable, unfair and against public policy.

## FACTUAL ALLEGATIONS

**A.   Kia Markets the Telluride as a Safe and Reliable Vehicle**

32.     Kia America, Inc. is the marketing and distribution arm of Kia Motors Corporation based Seoul, Korea. Headquartered in Irvine, California, Kia touts itself as having "been the highest ranked mass market brand in initial quality for five consecutive years according to J.D. Power, and is recognized as one of the 100 Best Global Brands by Interbrand."[1] Kia "offers a range of gasoline, hybrid, plug-in hybrid, and electric vehicles sold through a network of nearly 800 dealers in the U.S."[2]

33.     The Telluride is a three-row SUV and one of Kia's most popular models, selling approximately 123,281 in 2025.[3] Since Kia first launched the Telluride in 2019,

---

[1] KIA MEDIA, *Kia receives Six Top Safety Pick Ratings From Insurance Institute for Highway Safety* (Feb. 17, 2020), available at https://www.kiamedia.com/us/en/media/pressreleases/16009/kia-receives-six-top-safety-pick-ratings-from-insurance-institute-for-highway-safety.

[2] KIA MEDIA, *2027 Kia Telluride Named Best Three-Row Family Suv By The Northwest Automotive Press Association* (May 18, 2026), available at https://www.kiamedia.com/us/en/media/pressreleases/24671/2027-kia-telluride-named-best-three-row-family-suv-by-the-northwest-automotive-press-association-nwa.

[3] Keith Laing, *This is why the Telluride is one of Kia's most important cars*, USAToday (Mar. 26, 2026), available at https://www.usatoday.com/story/cars/news/2026/03/26/kia-telluride-most-important-car/89299528007/.

7

CLASS ACTION COMPLAINT

it has been named the best mid-size SUV several times over.[4] Kia insiders refer to it as the "Selluride" because of its unprecedented popularity.[5]

34. Upon release, Kia explained that the Telluride is "[i]magined in America, designed at Kia's design studio in California, [] assembled in Georgia, [and] the Telluride is the largest Kia ever. It provides comfortable seating for up to eight, a powerful 291-hp 3.8-liter V6, available active on-demand all-wheel drive, and an inspiring view of the world. The Telluride offers potential for exploration and adventure every time it's on the road."[6]

35. In 2025, the Telluride was named one of the "Best Cars for Families" by the U.S. News & World Report for the sixth year in a row.[7] Kia touts that the award honors cars that "offer the best combination of safety, reliability, space, convenience, and connectivity."[8] Kia's Chief Operating Officer and Executive Vice President of Kia America, Steven Center explains that "[t]hese accolades validate Kia's dedication to engineering high-quality vehicles designed to fulfill the needs of the entire family."[9]

36. Kia consistently represents that the Class Vehicles are safe and reliable, including in advertising that the "Telluride is engineered to be capable in a variety of

---

[4] *See, e.g.*, Eric Brandt, *Kia Telluride Is Our Midsize SUV Best Buy of 2025*, Kelly Blue Book (Feb. 2, 2025), available at https://www.kbb.com/awards/best-buy-awards-2025-kia-telluride-midsize-suv/.

[5] *Id.*

[6] KIA MEDIA, *2020 Telluride Overview* (Mar. 19, 2019), available at https://www.kiamedia.com/us/en/models/telluride/2020.

[7] KIA MEDIA, *Two Kia Models Win U.S. News & World Report 2025 "Best Cars for Families" Awards* (Mar. 20, 2025), available at https://www.kiamedia.com/us/en/media/pressreleases/23047/two-kia-models-win-us-news-and-world-report-2025-best-cars-for-families-awards.

[8] *Id.*

[9] *Id.*

8

CLASS ACTION COMPLAINT

driving conditions and provide a driving experience that is enjoyable and confidence-inspiring."[10]

37.    Kia also represents, through its authorized dealers, that the typical battery life is three to five years for the Class Vehicles.[11]

**B.    The Defect Renders the Class Vehicles Dangerous and Unfit for Ordinary Use**

38.    The Vehicle's electrical system consists of the battery, an alternator, various electrical and computer components, and various ECMs. The ECMs regulate the flow of electricity and are responsible for controlling the rate at which the Vehicle subsystem they govern will drain the battery.

39.    Like most modern cars, the Class Vehicles operate on a 12-volt battery. When the engine is turned off, the battery is the only source of power. The battery is used to start the engine, and must have sufficient charge to do so. Ordinarily, while the engine is running, the alternator is recharging the battery, the computer systems are fully operational, and the ECMs direct needed power accordingly. When a vehicle is turned off, most electronic components should enter a low-power "sleep mode." Certain modules remain accessible and lightly active in order to, for example, detect key fobs, receive remote-start commands, or monitor anti-theft systems. The battery is the exclusive source of power for these features while the Vehicles are turned off. In a properly operating vehicle, a small amount of battery drain is normal even while the vehicle is turned off.

40.    Properly functioning electrical components and ECMs work together to coordinate and regulate the flow of energy from the battery. However, where the electrical components and/or ECMs are improperly designed, manufactured, or

---

[10] KIA MEDIA, *All-New 2020 Kia Telluride Offers Rugged Luxury* (Mar. 19, 2019), available at https://www.kiamedia.com/us/en/media/pressreleases/23047/two-kia-models-win-us-news-and-world-report-2025-best-cars-for-families-awards.

[11] *See, e.g.*, Kia of Brandon, https://www.brandonkia.com/kia-telluride-battery.htm (last visited May 20, 2026).

CLASS ACTION COMPLAINT

installed, various electrical components and/or the ECMs will draw from the battery at an excessive rate, causing the battery to lose charge prematurely and one or more of the systems that depend on the battery will fail. The resulting "parasitic drain" is a defect introduced by the design and/or manufacture of the Vehicles.

41. The Class Vehicles suffer from parasitic drain as a result of a defect in the design or manufacture. Discovery will uncover the precise root cause.

42. Kia uniformly designed and/or manufactured the Class Vehicles with ECMs and/or associated electrical subsystems that cause parasitic drain in the Class Vehicles. These defective components were designed, installed, and/or manufactured by Kia, and were present in the Class Vehicles at the time of sale.

43. The Parasitic Drain results in numerous problems with the operation of the Class Vehicles. When parasitic drain depletes the battery while the Vehicle is turned off, the battery will not have sufficient charge to power the cabin lights or the unlock function on the key fob. Additionally, the battery will not have sufficient charge to start the engine, and the Class Vehicle will not turn on at all or absent assistance from an external power source.

44. The Parasitic Drain Defect also damages the Class Vehicles. Repeated and excessive depletion of the battery results in premature failure of the battery. Batteries only have a limited number of charging cycles because with each cycle the battery loses some of its storage capacity. This loss of storage is irreversible. Eventually, the battery will not be able to hold sufficient charge to support the Vehicle's essential electrical functions. No amount of external power will correct the issue. Through repeatedly drawing down the battery's charge, the Parasitic Drain Defect significantly shortens the battery's operational life.

45. Additionally, the Class Vehicles' battery works in tandem with the alternator to regulate voltage in the electrical system to avoid power surges that can damage the Vehicles' electrical components. When parasitic drain depletes the battery charge, the battery cannot assist the alternator in regulating energy flows to the Vehicles'

CLASS ACTION COMPLAINT

electrical components, which causes damage to those electrical components in the event of a power surge. The Parasitic Drain Defect also detrimentally affects the performance of the Class Vehicles while they are in operation on the road. Prior to the complete failure of a battery, parasitic drain causes key safety components (*e.g.*, hazard lights, power-steering, and speedometers) to fail, even when the Vehicle is in operation. As the battery degrades, the dashboard, headlights, and hazard lights flicker and may even turn off completely due to poor electricity flow coming from the battery and/or alternator. In severe cases, the dashboard turns off completely leaving drivers with no speedometer, the power steering faults, or the engine stalls in moving traffic.

46. The Parasitic Drain Defect poses significant safety risks, including stranding drivers and passengers in remote locations without assistance. The continuous and repeated depletion of the battery's charge can also detrimentally affect the Vehicle's safety features, leaving the car without anti-theft features, or in extreme circumstances, causing the Vehicle to stall while driving on the highway.

47. Kia warrants "the outstanding quality and durability of every new Kia that rolls off the assembly line."[12] The Vehicles come with a New Vehicle Limited Warranty ("NVLW") and a 10 year/100,000 mile Powertrain Limited Warranty, which Kia describes as "Industry-Leading."[13] The NVLW states that Kia will cover "most vehicle components and systems" for the shorter of 60 months or 60,000 miles and "applies to factory defects" and most repairs "due to workmanship or material defects."[14]

48. Even so, Kia has failed to provide any resolution, let alone a lasting resolution, for this known safety defect.

49. As a result of the Parasitic Drain Defect, and Defendant's continued concealment, Plaintiff Brenman and Class members have been forced to troubleshoot

---

[12] Kia Owners, Warranty, available at https://owners.kia.com/us/en/service-page/warranty.html (last visited May 21, 2026).

[13] Kia Warranty, available at https://www.kia.com/us/en/warranty (last visited May 21, 2026).

[14] *Id.*

CLASS ACTION COMPLAINT

the issue themselves and seek repeated assistance from Kia service centers, third-party mechanics, and towing companies.

**C.    The Parasitic Drain Defect Was in Kia's Exclusive Knowledge and Control**

50.    Throughout the relevant period, Kia designed, manufactured, distributed, imported, warranted, marketed, advertised, serviced, sold, and leased the Class Vehicles. Upon information and belief, Kia has sold, directly or indirectly through dealers and other retail outlets, hundreds of thousands of Class Vehicles in California, Maryland and nationwide.

51.    Kia's pre-release testing was substantially certain to detect the Parasitic Drain Defect. It manifests quickly, within months or days of purchase. Additionally, the Defect is easily detectible through common tests measuring the rate of electrical drainage from the battery. On information and belief, Kia conducted pre-sale testing, approved the defective electrical components and/or ECMs, and subsequently sold the Vehicles to Plaintiff and the Class without disclosing the Parasitic Drain Defect.

52.    Upon information and belief, Kia was notified as early as 2019 that the Vehicles are defective and not fit for their intended purpose of providing consumers with safe and reliable transportation. Nevertheless, Kia failed to recall the Vehicles or disclose the Parasitic Drain Defect to Plaintiff Brenman and Class members at the time of purchase or lease and thereafter.

53.    Prior to purchasing or leasing the Vehicles, Plaintiff and Class members did not know that the Vehicles suffered from the Parasitic Drain Defect and did not contemplate that they would be unable to reliably access and drive their Vehicles because of the Defect.

54.    No reasonable consumer expects parasitic drainage within the normal useful life of the battery or the Vehicles, and certainly not within months of purchase.

55.    The Parasitic Drain Defect presents a safety concern, and although numerous consumers have complained about and brought their Vehicle to Kia to address the Defect, Kia has failed to adequately address the Defect or issue a recall.

CLASS ACTION COMPLAINT

56.    Numerous online message board discussions and complaints highlight the dangers posed by the Defect. A sampling of these are below:

(Complaints from Kia Telluride Forum)[15]

---

[15]*Battery Drain*, Kia Telluride Technical Forums (various users), https://www.kiatelluride.org/threads/battery-drain-issue.1613/ (last visited May 20, 2026).

13

CLASS ACTION COMPLAINT



(From Facebook)[16]



CLASS ACTION COMPLAINT

(From Reddit)[17]

57. Online Reputation Management (ORM) is now a standard business practice among major companies and entails monitoring consumer forums, social media, and other sources on the internet where consumers can review or comment on products. ORM involves the monitoring of the reputation of an individual or a brand on the internet, addressing content, which is potentially damaging to it, and using customer feedback to try to solve problems before they damage the individual's or brand's reputation. Many companies offer ORM consulting services for businesses. Like most companies, Kia cares about its reputation and regularly monitors online customer reviews because they provide valuable data regarding quality control issues, customer satisfaction, and marketing analytics. Negative reviews like those displayed above would be particularly

---

[16] FACEBOOK, https://www.facebook.com/groups/432208147570999/posts/2028751954583269/ (last visited May 20, 2026); FACEBOOK, https://www.facebook.com/groups/432208147570999/posts/1535867343871735/ (last visited May 20, 2026).

[17] REDDIT, https://www.reddit.com/r/KiaTelluride/comments/1onjuyk/what_can_cause_the_telluride_battery_to_die/ (last visited May 20, 2026).

CLASS ACTION COMPLAINT

attention-grabbing for Kia's management because extreme reviews are often the result of material problems—i.e., poor performance and a disconnect between the Vehicles received and user expectations. As such, on information and belief, Kia's management knew about the above-referenced consumer complaints shortly after each complaint was posted.

**D.   Consumers Have Reported the Defect to NHTSA**

58.   Kia, like other automobile manufacturers, reviews complaints made by consumers to the NHTSA.

59.   Consumers have reported the Parasitic Drain Defect to the NHTSA, and indicate having taken their Vehicles to Kia authorized dealerships in their attempts to have the Defect repaired.

60.   Examples of complaints made to the NHTSA about the Vehicles' failure to start are shown below, unedited:

- **NHTSA ID Number: 11556445; Report date: 11/21/2023; Model Year: 2023.**
  There is something wrong with the electrical system that drains the battery. I keep getting. [sic] An ESC code, and then the battery goes dead. The car has been at the dealership for the past three days and they are unable to duplicate the problem. I showed them a video I took of the instrument cluster which shows the code and electrical issues. The Kia dealership says they cannot do anything about the code because they are unable to duplicate the air while the vehicle is in their possession. This has happened twice on a new 2023 car. The dealership says they are returning me my vehicle with no resolution. So essentially, I'm getting a broken car returned to me. When you online search "ESC" Kia there appears to be a lot of complaints about this exact same issue but no fix?

- **NHTSA ID Number: 11518264; Report date: 4/21/2023; Model Year: 2021.**
  My wife had placed our two children in the car in their car seats. She attempted to start the vehicle by pressing the brake and the starter button. Though all the dome lights and other normal electrical items were on at the time, as soon as she attempted to start the car, it instantly went dead. There was no power to anything, and all the interior dome lights did not work. No

CLASS ACTION COMPLAINT

matter how often she attempted, she could not start the vehicle, even with accessory mode. It was almost as if the battery had been suddenly removed from the vehicle. At no point was the car moved outside of park. My wife removed our two kids from the vehicle, and shortly after, they were secured in our other vehicle; without my wife being in the Telluride, the car turned on itself. All interior lights were on, and the car was functional. She found that while the radio was on, the HVAC that had been on was now off. In addition, the fuel performance reset to zero. She turned off the vehicle, and we could not reproduce the issue. From a safety perspective, this was very unnerving as it involved our children in our car, but also that the car started on its own after five minutes. If we were not at home and the car could have been running in the garage without our involvement. All regular maintenance and satisfaction of recalls had been completed by a Kia-authorized dealership before this event.

- **NHTSA ID Number: 11564861; Report date: 1/11/2024; Model Year: 2020.**
  I have a fairly brand new 2020 Kia Telluride with only about 50,000 miles on it and one day out of no where [sic] the car won't start and now I'm getting a check ESC message. Since it's fairly new I had it jump started and the car quickly turned on and ran fine for the rest of the day. The following day the car hesitated when turning on but it started. I was driving and when I got to a light and when the light turned green and went to take off the car wouldn't go. It turned off again and would start back up. I went into the KIA forum and noticed that a lot of Kia Telluride owners are experiencing this same issue but all seem to have different resolutions from needing a new battery, or a new starter or that the IBU system is blown. This is very frustrating because I don't necessarily know where I need to begin and I don't want to have waste my money with trying to figure out exactly what is going on with my car.

- **NHTSA ID Number: 11564861; Report date: 5/9/2024; Model Year: 2020.**
  My 2020 Kia Telluride SX model won't start, I get an error "Check ESC". [sic] It will also have other warning ligts [sic] come on also. The failure from the start seemed like the bad battery and a (TOC TOC) sound was heard when trying to turn it on several times Had the checked the battery and replaced because it was bad, after a month days it began to have the problem again Jumpstarting the car worked but only temporarily. The next day, or within a few hours the same issue of not turning over.

17

CLASS ACTION COMPLAINT

- **NHTSA ID Number: 11643138; Report date: 2/17/2025; Model Year: 2023.**
  Battery Drain. No lights left on, nothing plugged in. I suspect IBU Module or some other wiring tobe [sic] causing a parasitic draw. This has been a common issue and KIA needs to address it with a recall.

- **NHTSA ID Number: 11705382; Report date: 12/16/2025; Model Year: 2020.**
  When parked on an incline, the vehicle will not start and has to have the battery jumped. When attempting to start the vehicle, you can hear a clicking sound and an error message pops up saying "Check ESP". After this happens, the windows will roll down to about a 1/8 crack and will not roll up even after the car has been jumped and is on.

- **NHTSA ID Number: 11720148; Incident date: 2/24/2026; Model Year: 2021.**
  Cooling fans running continuously after the car is turned off, which drains the battery. The dealership has identified that this is due to a faulty fan relay that will need to be completely replaced. The battery has been replaced once and the issue continued indicating that it was not a battery issue. The car ran out of battery in a busy location and caused risk to the passengers that were then exposed to busy traffic. The car has been inspected by repair specialists at the Vaden Hyundai Service Center. There were no warning lamps, messages or other symptoms before the problem began.

- **NHTSA ID Number: 11518264; Incident date: 4/7/2023; Model Year: 2021.**
  After a few months from purchasing (9/2022), I noticed some weird electrical issues occurring. The first thing I noticed was that sometimes the rear wiper blades would turn on automatically when shifting in reverse when the wiper blades were off. I would turn the rear wiper blades on then off repeated times until they finally stayed in off mode. As time went on, then the drivers side window would roll down automatically after starting the vehicle, and it would not shut all the way after pressing the button. I would have to hold the up button when turning the engine off, just so the window would remain completely closed when parked. Sometimes, this would continue for a week or more...then it would go back to normal for a few months. These issues would continue and others started to arise such as the check engine lights, low battery etc. appearing while starting the vehicle. Sometimes it would say that the engine is on, when it wasn't...so I would hear a warning signal when trying to leave the vehicle with my key fob. I

18

CLASS ACTION COMPLAINT

would have to press the stop engine button and wait for it to say that the engine is off. This evolved into the car struggling to start...with a repeated clicking noise being heard. All warning and hazard notifications appear on the main screen and the driver's side window rolls down by itself and it takes 5-7 minutes for it to start, but eventually does. This has been going on now for since March of 2024...so it's not a battery issue, or a starter issue...but based on the nature of these malfunctions...it is electrical issues...which can pose a serious safety threat...especially with a potential electrical fire. What are our options for a potential manufacturer recall? As of this writing, it took roughly 20 minutes to start my vehicle, as it is very cold in Rochester, NY. I recently had my vehicle fully serviced (8/25) and it wasn't acting up at the time so they couldn't pinpoint any electrical issues. I took videos of the incidents.

61.    Given Kia's obligations to monitor and report defects to NHTSA, and the volume of complaints in public message boards and NHTSA complaints, Kia knew but failed to report the defect to the public. These acts and omissions violated various laws as detailed below, including Maryland state consumer protection laws.

62.    Defendant has long known that the Vehicles have a parasitic drain defect. Defendant has exclusive access to information about the Defect through its dealerships, pre-release testing data, warranty data, customer complaint data, and replacement part sales data, among other sources of aggregate information about the problem. In contrast, the Defect was not known or reasonably discoverable by Plaintiff and Class members prior to purchase and without experiencing the Parasitic Drain Defect firsthand.

63.    Defendant owes a duty to disclose the Defect to Plaintiff and Class Members because Defendant has exclusive knowledge or access to material facts about the Vehicles that are not known or reasonably discoverable by Plaintiff and Class members until, and even after, the defect has manifested; and because Defendant has actively concealed the Defect from its customers.

64.    Kia has been aware of the ongoing issue and, to date, Kia has failed to remedy the Defect and continues to sell the Class Vehicles despite its knowledge of the Defect.

19

CLASS ACTION COMPLAINT

65.     To date, Kia has not demonstrated that it is capable of providing an adequate repair for the Defect, and Plaintiff and Class members do not know whether Kia is capable of providing a repair for the Defect. Presently, without the benefit of discovery, it is for all practical purposes impossible to know whether a remedy at law or in equity will provide the appropriate full relief for Plaintiff and Class members. As a result, Plaintiff, at this stage of the litigation, seeks both restitution and a remedy at law, where the claims so permit. Further, Plaintiff seeks an injunction enjoining Kia and its agents, servants, and employees, and all persons acting under, in concert with, or for it from selling or leasing Class Vehicles without notice that they are subject to the Defect, which cannot be repaired.

**E.     Kia Fails to Respond to the Defect**

66.     Kia knew of the Defect at the time of sale or lease of the defective Vehicles. Plaintiff and Class members, however, had no such knowledge, as the Defect is latent in nature and not ascertainable upon reasonable examination of the Vehicle.

67.     Upon presentment of the Class Vehicles with the Defect, class members are routinely told that the Defect is not covered under the applicable warranty as it is expected wear on the battery, and Class members are forced to pay out of pocket for new batteries and incidental costs incurred related to the battery failure, e.g., towing, rideshares.

68.     As seen above in numerous consumer complaints, the cost of replacing batteries can be hundreds of dollars. Further, many class members report having to replace their batteries multiple times in short periods, which can cost hundreds or thousands of dollars. Replacing the batteries also does not fix the underlying Defect.

69.     Despite having more than an adequate opportunity to successfully remedy the Defect in the Vehicles, Kia has failed to do so. Kia dealers have attempted various fixes but none appears to resolve the problem.

70.     Kia concealed, and continues to conceal, and omitted and omits, the fact that the Vehicles contain the Defect. Kia also continues to conceal the fact that replacing the batteries will not fix the Defect. Despite its knowledge of the Defect, Kia continued to

20

CLASS ACTION COMPLAINT

sell Vehicles without disclosing this material information and instead omitting it, a fact which Vehicle owners and lessees cannot reasonably discover until after the purchase is made.

71. Then, when batteries prematurely drain, Kia (through the sale of OEM parts) and its Kia dealerships reap significant financial benefits by forcing consumers to replace parts at their own costs. And, because replacement parts do not fix the Defect, it is only a matter of time before replacement batteries prematurely drain and need to be replaced.

**F. The Defect Has Harmed Plaintiff and The Class**

72. The Defect has caused injury to Plaintiff Brenman and the Class. Plaintiff Brenman and Class members have out-of-pocket losses related to repairing, maintaining, and servicing their defective Vehicles and costs associated with arranging and obtaining alternative means of transportation, and other incidental and consequential damages recoverable under the law.

73. Plaintiff and the Class have also been damaged by Defendant's misrepresentations, concealment, and non-disclosure of the Defect in the Vehicles because they purchased Vehicles they otherwise would not have purchased, paid more for those Vehicles than they would have paid, are subjected to an unreasonable risk to their safety, and unnecessarily paid and will continue to pay repair costs. They did not receive the benefit of their bargain.

74. Had Plaintiff and Class members known about the Defect at the time of sale or lease, as well as the associated costs related to the Parasitic Drain Defect, Plaintiff and Class members would not have purchased the Class Vehicles or would have paid less for them.

75. Plaintiff and the Class have been denied the use and enjoyment of the Vehicles, suffering safety hazards when their Vehicles failed to start or operate as needed. The unreliability of the battery and electrical system leaves Plaintiff Brenman and Class members concerned that the system could fail at any time.

21

CLASS ACTION COMPLAINT

76.     The Vehicles were worth less than they would have been but for Defendant's failure to disclose and remedy the Parasitic Drain Defect.

**TOLLING OF THE STATUTE OF LIMITATIONS AND ESTOPPEL**

77.     Any applicable statute of limitations has been tolled by Defendant's knowing and active concealment of the Defect and misrepresentations and omissions alleged herein. Through no fault or lack of diligence, Plaintiff Brenman and members of the Class were deceived regarding the Class Vehicles and could not reasonably discover the Defect or Defendant's deception with respect to the Defect.

78.     Plaintiff Brenman and Class members did not discover and did not know of any facts that would have caused a reasonable person to suspect that Defendant was concealing a defect and/or the Class Vehicles contained the Defect and the corresponding safety risk. As alleged herein, the existence of the Defect was material to Plaintiff and members of the Class at all relevant times. Within the time period of any applicable statutes of limitations, Plaintiff and members of the Class could not have discovered— through the exercise of reasonable diligence—the existence of the Defect or that the Defendant was concealing the Defect.

79.     At all times, Defendant is and was under a continuous duty to disclose to Plaintiff and Class members the true standard, quality, and grade of the Class Vehicles and to disclose the Defect and corresponding safety risk due to their exclusive and superior knowledge of the existence and extent of the Defect in Class Vehicles.

80.     Defendant knowingly, actively, and affirmatively concealed the facts alleged herein, and the Defect itself. Plaintiff and Class members reasonably relied on Defendant's knowing, active, and affirmative concealment.

81.     For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Defendant's fraudulent concealment, and Defendant is estopped from relying on any statutes of limitations.

**CLASS ACTION ALLEGATIONS**

CLASS ACTION COMPLAINT

82.     Plaintiff seeks relief in his individual capacity and seeks to represent a class consisting of all others who are similarly situated.  Pursuant to Fed. R. Civ. P. 23(a) and (b)(2) and/or (b)(3), Plaintiff seeks certification of a Class initially defined as follows:

**All persons in the United States who formerly or currently own or lease one or more of the Class Vehicles.**

83.     Plaintiff also seeks relief in his individual capacity and seeks to represent a subclass consisting of all others who are similarly situated.  Pursuant to Fed. R. Civ. P. 23(a) and (b)(2) and/or (b)(3), Plaintiff seeks certification of a subclass (the "Maryland Class") initially defined as follows:

**All persons in the State of Maryland who formerly or currently own or lease one or more of the Class Vehicles, purchased and/or serviced in the State of Maryland.**

84.     Excluded from the Class and/or Subclass are Defendant and its subsidiaries and affiliates, Defendant's executives, board members, legal counsel, the judges and all other court personnel to whom this case is assigned, their immediate families, and those who purchased the Vehicle for the purpose of resale.

85.     Plaintiff reserves the right to amend or modify the Class and subclass definitions with greater specificity or division into other subclasses after he has an opportunity to conduct discovery. Additionally, the models and model years of vehicles comprising the Class Vehicles are subject to revision based upon information learned through the discovery process.

86.     <u>Numerosity</u>.  Fed. R. Civ. P. 23(a)(1).  The Class and subclass are so numerous that joinder of all members is unfeasible and not practicable. While the precise number of Class members has not been determined at this time, Plaintiff is informed and believes that at least or near 100,000 consumers in the United States have purchased or leased the Class Vehicles.

CLASS ACTION COMPLAINT

87.    Commonality. Fed. R. Civ. P. 23(a)(2) and (b)(3).  There are questions of law and fact common to the Class and subclass, which predominate over any questions affecting only individual Class members.  These common questions of law and fact include, without limitation:

a.    whether Kia engaged in the conduct alleged herein;

b.    whether there is a Defect in the Class Vehicles;

c.    whether Kia sold and leased Vehicles with pre-sale knowledge of the Defect;

d.    whether Kia knew or should have known of the Defect, and if so, how long it knew of this Defect;

e.    whether Kia knowingly failed to disclose and misrepresented material facts to purchasers and lessees of Class Vehicles;

f.    whether the Class Vehicles are unmerchantable;

g.    whether Kia breached warranties;

h.    whether Kia's conduct alleged herein violates consumer protection statutes, warranty laws, and other laws as asserted herein;

i.    whether Plaintiff and Class members overpaid for their Vehicles in light of the Defect; and

j.    the nature of the relief, including equitable relief, to which Plaintiff and the Class members are entitled.

88.    Typicality. Fed. R. Civ. P. 23(a)(3). Plaintiff's claims are typical of the claims of the Class. Plaintiff and all Class members were exposed to uniform practices and sustained injury arising out of and caused by Defendant's unlawful conduct.

89.    Adequacy of Representation. Fed. R. Civ. P. 23(a)(4). Plaintiff will fairly and adequately represent and protect the interests of the members of the Class and subclass. Plaintiff's Counsel are competent and experienced in litigating class actions.

90.    Superiority of Class Action. Fed. R. Civ. P. 23(b)(3). A class action is superior to other available methods for the fair and efficient adjudication of this

CLASS ACTION COMPLAINT

controversy since joinder of all the members of the Class is impracticable. Furthermore, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the asserted claims. There will be no difficulty in the management of this action as a class action.

91.     Injunctive and Declaratory Relief. Fed. R. Civ. P. 23(b)(2). Defendant's misrepresentations are uniform as to all members of the Class and subclass. Defendant has acted or refused to act on grounds that apply generally to the Class and subclass, so that final injunctive relief or declaratory relief is appropriate with respect to the Class and subclass as a whole.

### FIRST CAUSE OF ACTION
**Violations of the Maryland Consumer Protection Act**
**Md. Code Com. Law § 13-101, *et seq.* ("MCPA")**
**(On Behalf of Plaintiff and the Maryland Class)**

92.     Plaintiff incorporates by reference and re-alleges the preceding paragraphs.

93.     Plaintiff Brenman brings this claim on behalf of himself and the members of the Maryland Class.

94.     The MCPA prohibits a person from engaging "in any unfair, abusive, or deceptive trade practice" in the "sale" or "lease . . . of any consumer goods." *See* Md. Code Ann., Com. Law § 13-303.

95.     The MCPA defines "[u]nfair, abusive, or deceptive trade practices" to include any "[f]alse, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers." Md. Code Ann., Com. Law § 13-301(1). The MCPA also prohibits any "[d]eception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with . . . [t]he promotion or sale of any consumer goods." Md. Code Ann., Com. Law § 13-301(9) – 13-301(9)(i).

CLASS ACTION COMPLAINT

96.    Plaintiff Brenman and Maryland Class members are "consumers" within the meaning of the MCPA. *See* Md. Code Ann., Com. Law § 13-301(c).

97.    The Class Vehicles are "consumer goods" within the meaning of the MCPA. *See* Md. Code Ann., Com. Law § 13-301(d).

98.    Defendant is a "person" within the meaning of the MCPA. *See* Md. Code Ann., Com. Law § 13-101(h).

99.    By the conduct described in detail above and incorporated herein, Kia violated the MCPA.

100.    In the course of its business, Kia and its agents, employees, and/or subsidiaries, violated the MCPA by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the reliability, safety and performance of the Class Vehicles or the defective electrical systems, as detailed above. Kia violated the MCPA and committed unfair and deceptive acts in the course of trade and commerce within the context of the MCPA as described in this Complaint in at least the following respects:

a.    In violation of §§ 13-301(2)(i) and 13-303, Kia represented that Class Vehicles and/or the electrical systems installed in them have characteristics, uses, benefits, and qualities which they do not have;

b.    In violation of §§ 13-301(2)(iv) and 13-303, Kia represented that Class Vehicles are of a particular standard, quality or grade, when they are not;

c.    In violation of §§ 13-301(3) and 13-303, Kia failed to state material facts that deceive or tend to deceive;

d.    In violation of §§ 13-301(5)(i) and 13-303, Kia advertised the Class Vehicles without the intent to sell or lease the Vehicles as advertised;

e.    In violation of §§ 13-301(7) and 13-303, Kia sold/leased Class Vehicles knowing that a service, replacement or repair was needed;

26

CLASS ACTION COMPLAINT

f. In violation of §§ 13-301(9) and 13-303, Kia committed unconscionable, deceptive and unfair trade practices, including, but not limited to, deception, fraud, false pretense, false premise, misrepresentation and the knowing concealment, suppression and omission of material facts concerning the Parasitic Drain Defect in Class Vehicles and that the vehicles are prone to battery failure, causing electrical system malfunction, vehicle stalls, and inoperability.

101. Defendant knowingly and intentionally misrepresented to Plaintiff Brenman and Maryland Class members the characteristics of the Class Vehicle electrical systems with respect to materials, manufacture, durability, design, longevity, maintenance and operating costs in at least the following respects:

g. Consistently representing in their marketing and promotional materials that the Class Vehicles are safe and reliable;

h. Consistently representing in information supplied through their authorized dealerships that the batteries of the Class Vehicles last three to five years;

i. Failing to disclose that the Vehicles were manufactured, installed, and sold/leased to consumers with defective electrical systems, components and/or ECMs that cause excessive battery drain resulting in premature failure of the battery; and

j. Failing to disclose that the Defect causes safety hazards, including: inability to start the engine; inability to access the Vehicle with the key fob; engine stalling while the Vehicle is in operation; dimming and failure of key safety features, including the headlights, interior lights, and/or hazard lights; excessive strain on the alternator causing premature failure; and failure of other essential electrical components such as the digital speedometer display and power steering.

27

CLASS ACTION COMPLAINT

102.    Kia's misrepresentations and omissions regarding the Defect had a tendency or capacity to mislead and create a false impression in consumers, and were likely to, and did in fact, deceive reasonable consumers, including the Plaintiff Brenman and Maryland Class members, about the true safety, reliability, quality, and value of Class Vehicles.

103.    These misrepresented and omitted facts are material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) a Class Vehicle. The Defect directly impacts the value of the Class Vehicles. The Vehicles' ability to turn on and maintain power are material concerns to consumers. Defendant represented to Plaintiff Brenman and the Maryland Class members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, and of high quality as alleged throughout this Complaint, when in fact their batteries frequently fail, necessitating premature and costly replacements, and subjecting Plaintiff Brenman and Maryland Class members to increased risk of collisions and/or being stranded without transportation.

104.    Kia knowingly misrepresented, concealed, and omitted material facts regarding the Class Vehicles with the intent to mislead Plaintiff Brenman and the Maryland Class members.

105.    Kia misled Plaintiff Brenman and members of the Class and suppressed and concealed this information at the time of sale/lease, despite having actual knowledge of the Defect from at least the following sources that were exclusively in Kia's possession: (1) pre-release testing data; (2) Kia's own records of consumer complaints; (3) data from Kia's dealers, including their repair records and part orders; (4) consumer complaints lodged with NHTSA and the resulting notice; (5) warranty and post-warranty claims; (6) testing conducted in response to owner or lessee complaints; and (7) other internal sources of aggregate information about the ongoing electrical system issues.

106.    Kia owed Plaintiff Brenman and the Maryland Class members a duty to disclose the truth about the Defect because Defendant: (a) possessed exclusive knowledge

28

CLASS ACTION COMPLAINT

of the Parasitic Drain Defect; (b) intentionally concealed the foregoing from Plaintiff Brenman and the Maryland Class members; (c) made incomplete and misleading representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Plaintiff Brenman and the Maryland Class members that contradicted these representations; and/or (d) the Motor Vehicle Safety Act, 49 U.S.C. § 30118(c), places a duty on manufacturers to report vehicle defects such as the Defect described herein and its corresponding safety risks.

107.    Due to Kia's exclusive and superior knowledge that the electrical system in the Class Vehicles have the Parasitic Drain Defect, Kia's false representations regarding the qualify, safety, reliability, and performance of the Class Vehicles, and reliance by Plaintiff Brenman and the Maryland Class members on these material misrepresentations, Defendant had a duty to disclose to Plaintiff Brenman and Class members that the electrical systems and batteries in Class Vehicles are prone to failure and can cause sudden engine stalling, rendering the Class Vehicles inoperable and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Plaintiff Brenman and the Maryland Class members, Defendant had a duty to disclose not just the partial truth, but the entire truth.

108.    Kia also violated the MCPA by failing to inform Plaintiff Brenman and Class members prior to purchase/lease and/or during the warranty period that Class Vehicle electrical systems were defectively designed and/or manufactured and that the Defect would require costly replacement or repair.

109.    As a direct and proximate result of Defendant's violations of the MCPA, Plaintiff Brenman and Maryland Class members have suffered injury-in-fact and/or actual damages. Plaintiff Brenman and the Maryland Class members were harmed and suffered actual damages, including the diminished value of their vehicles and costs incurred in responding to and repairing repeated electrical system and battery failures.

CLASS ACTION COMPLAINT

110. Kia's violations present a continuing risk to Plaintiff Brenman as well as to the general public. Kia's unlawful acts and practices complained of herein affect the public interest because the Vehicles are unfit to safely drive on the road.

111. Pursuant to Md. Code Com. Law § 13-408, Plaintiff Brenman and Maryland Class members seek actual damages, attorneys' fees, and any other just and proper relief available under the MCPA.

## SECOND CAUSE OF ACTION
### Fraud/Fraudulent Omission
### (On Behalf of Plaintiff and the Nationwide Class, or, alternatively, the Maryland Class)

112. Plaintiff incorporates by reference and re-alleges the preceding paragraphs.

113. Plaintiff brings this claim individually and on behalf of the nationwide Class, or, alternatively, on behalf of the Maryland Class.

114. Kia actively, intentionally, and knowingly misrepresented, concealed, and/or omitted material facts including the existence of the Defect and the corresponding safety risk, and the standard, quality, or grade of the Vehicles. Kia did so with the intent that Plaintiff Brenman and Class members rely on Kia's misrepresentations and omissions.

115. Kia knew at the time of sale or lease and thereafter that the Vehicles contained the Defect, omitted material information about the safety of the Vehicles, and actively concealed the Defect. To date, Defendant has not provided Plaintiff and members of the Class with an adequate repair or remedy for the Defect.

116. For the reasons set forth above, including that Kia possessed superior and exclusive knowledge regarding the Defect, Kia had a duty to disclose the true performance of the electrical system and the Class Vehicles.

117. Kia made misleading statements, material omissions, and fraudulently concealed a presently existing safety defect through the conduct alleged herein, including:

30

CLASS ACTION COMPLAINT

a. Consistently representing in their marketing and promotional materials that the Class Vehicles are safe and reliable;

b. Consistently representing in information supplied through their authorized dealerships that the batteries in the Class Vehicles last 3-5 years;

c. Failing to disclose that the Vehicles were manufactured, installed, and sold/leased to consumers with defective ECMs and/or electrical components that cause excessive battery drain resulting in premature failure of the battery; and

d. Failing to disclose that the Parasitic Drain Defect causes safety hazards, including: inability to start the engine; inability to access the Vehicle with the key fob; engine stalling while the Vehicle is in operation; dimming and failure of key safety features, including the headlights, interior lights, and/or hazard lights; excessive strain on the alternator causing premature failure; and failure of other essential electrical components such as the digital speedometer display and power steering.

118. Defendant misled Plaintiff Brenman and members of the Class and suppressed and concealed this information, despite having actual knowledge of the Defect from at least the following sources that were exclusively in Kia's possession: (1) pre-release testing data; (2) Kia's own records of consumer complaints; (3) data from Kia's dealers, including their repair records and part orders; (4) consumer complaints lodged with NHTSA and the resulting notice; (5) warranty and post-warranty claims; (6) testing conducted in response to owner or lessee complaints; and (7) other internal sources of aggregate information about the ongoing electrical system issues.

119. The Defect is material to Plaintiff Brenman and the members of the Class. Plaintiff Brenman and the members of the class had a reasonable expectation that the Vehicles would not contain a Defect that causes their battery and electrical system to fail and that exposes them and others to a safety risk.

CLASS ACTION COMPLAINT

120. Plaintiff Brenman and members of the Class would not have purchased or leased the Vehicles but for Defendant's omissions and concealment of material facts regarding the nature and quality of the Vehicles and the existence of the Defect and corresponding safety risk, or would have paid less for the Vehicles.

121. As a result, Plaintiff Brenman and the other Class members were fraudulently induced to lease and/or purchase the Vehicles with the Defect and all the resulting problems.

122. Kia knew its concealment and suppression of the Defect was false and misleading, and Kia intended to induce Plaintiff Brenman and Class members into purchasing or leasing the Vehicles.

123. Defendant acted with malice, oppression, and fraud. Kia fraudulently and maliciously seeks to profit from the misrepresentation and concealment of the Defect by instructing members of the Class to buy Kia's replacement Vehicle components, such as replacement batteries, alternators, and jumper cables.

124. Kia continues to suppress and conceal the source of the Defect, and continues to misrepresent the nature and extent of the Defect, by failing to adequately diagnose and repair the source of the Defect, failing to recall the Class Vehicles in light of their knowledge of the Defect and its effects, and by blaming consumers for using their Class Vehicles in ordinary ways instead of admitting and repairing the true source of the Defect.

125. Plaintiff Brenman and the members of the Class reasonably relied upon Defendant's knowing misrepresentations, concealment and omissions. As a direct and proximate result of Defendant's misrepresentations, omissions and active concealment of material facts regarding the Defect and the associated safety risk, Plaintiff Brenman and the members of the Class have suffered actual damages in an amount to be determined at trial. To the extent that Kia's conduct was willful, oppressive, or malicious, Plaintiff Brenman and Class members are entitled to an award of punitive damages.

## THIRD CAUSE OF ACTION
### Breach of Express Warranty
### (On Behalf of Plaintiff and the Nationwide Class, or, alternatively, the Maryland Class)

126.    Plaintiff incorporates by reference and re-alleges the preceding paragraphs.

127.    Plaintiff brings this claim individually and on behalf of the nationwide Class, or, alternatively, on behalf of the Maryland Class.

128.    Kia is a "merchant" as defined under the Uniform Commercial Code ("UCC").

129.    The Class Vehicles are "goods" as defined under the UCC.

130.    Kia provided warranties, including the NVLW, that expressly warranted Kia would repair certain defects in materials or workmanship during the applicable warranty period. Kia offers similar warranties on certified pre-owned Kias and extended warranties for both new and used vehicles.

131.    Kia also expressly warranted that the Vehicles were of high quality and, at a minimum, would function properly. Kia specifically warranted attributes and qualities of the Kia electrical systems in the Vehicles as detailed above, including with respect to performance, quality, operability, convenience, and safety.

132.    Kia breached its express warranties by selling to Plaintiff Brenman and Class members Vehicles with defective electrical systems, components, and/or ECMs which are not of high quality, and which are predisposed to experiencing premature battery drain, presenting an unreasonable safety risk.

133.    Kia also breached its express warranties by failing to provide an adequate repair when Plaintiff Brenman and Class members brought their Class Vehicles to authorized Kia dealerships following manifestation of the Parasitic Drain Defect.

134.    These warranties formed the basis of the bargain reached when Plaintiff Brenman and Class members purchased or leased their Class Vehicles equipped with defective electrical systems and/or components.

33

CLASS ACTION COMPLAINT

135. Plaintiff Brenman and Class members experienced the Parasitic Drain Defect during the warranty period, some within days of purchase. Despite the existence of the express warranties, Kia failed to inform Plaintiff Brenman and Class members that the Class Vehicles were defective and failed to fix or eliminate the Defect.

136. The limited warranty's promise to repair and/or correct a manufacturing defect fails in its essential purpose because Defendant has failed and/or refused to adequately provide the promised remedies within a reasonable timeframe.

137. As a result of Defendant's actions, Plaintiff Brenman and Class members have suffered economic damages including, but not limited to, costly repairs, loss of vehicle use, diminished vehicle value, substantial loss in resale value of the vehicles, and other related damages.

138. Defendant should have known of the Defect prior to selling the Vehicles because of the required pre-sale testing described herein.  Thereafter, Defendant received additional and adequate notice of the issues complained of herein through complaints filed with the NHTSA, dealership visits, internal customer complaints, *inter alia*, within a reasonable amount of time.

139. Plaintiff Brenman and the Class members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendant's conduct described herein.

### FOURTH CAUSE OF ACTION
**Breach of Implied Warranty of Merchantability**
**(On Behalf of Plaintiff and the Nationwide Class,**
**or, alternatively, the Maryland Class)**

140. Plaintiff incorporates by reference and re-alleges the preceding paragraphs.

141. Plaintiff brings this claim individually and on behalf of the Nationwide Class or, in the alternative, on behalf of the Maryland Class.

142. Kia is a "merchant" as defined under the Uniform Commercial Code ("UCC").

34

CLASS ACTION COMPLAINT

143. The Class Vehicles are "goods" as defined under the UCC.

144. A warranty that the Class Vehicles were in merchantable condition and fit for ordinary purposes for which they were sold or leased is implied by law. Kia impliedly warranted that the Class Vehicles were of good and merchantable condition and quality, fit for their ordinary intended use, including with respect to safety, reliability, operability, and substantial freedom from defects.

145. The Class Vehicles, when sold or leased, and at all times thereafter, were not of merchantable quality or condition and were not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that the electrical system—a central and critical component of the Class Vehicles that goes to the Vehicles' core functionality—and/or its components are prone to malfunction and failure due to a common defect. The Class Vehicles left Kia's possession and control with the Defect that rendered them at all times thereafter unmerchantable, unfit for ordinary use, unsafe, and a threat to safety.

146. Kia knew before the time of sale to Plaintiff Brenman and the other Class members, or earlier, that the Vehicles were produced with defective electrical systems and/or components that rendered the Vehicles unfit for their ordinary purposes and that posed a serious safety threat to drivers, passengers, and everyone else sharing the road with the Vehicles. This knowledge was based on Defendant's own industry standard internal validation of its vehicles prior to launching new models, internal and required pre-sale testing, and knowledge about and familiarity with the electrical systems included in the Vehicles. Within a reasonable time thereafter, Defendant received additional and adequate notice of the issues complained of herein by complaints with the NHTSA, dealership visits, and customer complaints, *inter alia*.

147. The existence and ubiquity of the Defect is illustrated by the numerous publicized consumer complaints, disputes, and failed remedial measures nationwide.

148. Despite Plaintiff Brenman's and Class members' normal, ordinary, and intended use, maintenance, and upkeep, the electrical systems and batteries in the Class

35

CLASS ACTION COMPLAINT

Vehicles experienced, and continue to experience, the Defect and premature failure.

149. The electrical systems, batteries, and Class Vehicles are, and at all times were, not of fair or average quality, and would not pass without objection.

150. All conditions precedent have occurred or been performed.

151. Plaintiff and Class members have used their Vehicles in a manner consistent with the Vehicles' intended use, and have performed each and every duty required under Kia's warranty, including presentment, except as may have been excused or prevented by Kia's conduct or by operation of law in light of Kia's unconscionable conduct described throughout this Complaint.

152. Kia received timely notice regarding the problems at issue in this litigation and, notwithstanding such notice, has failed and refused to offer an effective remedy.

153. Privity of contract is not required for consumer implied warranty claims under the relevant laws. However, Plaintiff Brenman and Class members have had sufficient direct dealings with Kia and its agents (*e.g.*, dealerships and customer service) to establish privity of contract between Kia, on the one hand, and Plaintiff Brenman and each of the Class members, on the other hand. Nonetheless, privity is not required here because Plaintiff Brenman and each of the Class members are intended third-party beneficiaries of contracts between Kia and its dealers (*i.e.*, its agents), specifically, they are the intended beneficiaries of Kia's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided alongside the Class Vehicles; the warranty agreements were designed for and intended to benefit the end-consumers. Privity is also not required because Plaintiff's and the other Class members' Vehicles are inherently dangerous due to the Defect.

154. As a direct and proximate result of the breach, Plaintiff Brenman and Class members were injured and are entitled to damages including, but not limited to, diminution in the value of their Vehicles, out-of-pocket losses related to repairing, maintaining, and servicing their defective Vehicles, costs associated with arranging and

CLASS ACTION COMPLAINT

obtaining alternative means of transportation, and other incidental and consequential damages recoverable under the law.

## FIFTH CAUSE OF ACTION
### Unjust Enrichment
### (On Behalf of Plaintiff and the Nationwide Class, or, alternatively, the Maryland Class)

155.   Plaintiff incorporates by reference and re-alleges the preceding paragraphs.

156.   Plaintiff brings this claim individually and on behalf of the nationwide Class, or, alternatively on behalf of the Maryland Class.

157.   This claim is pleaded in the alternative to the other claims herein, and seeks restitution of ill-gotten gains.

158.   As a direct and proximate result of Kia's omissions and its failure to disclose the known Defect, Kia has profited through the sale and lease of the Class Vehicles and subsequently by profiting on the purchase of replacement parts and charging Plaintiff and other Class members for expensive repairs to their Class Vehicles when the batteries inevitably fail. Although these Vehicles are purchased through Kia's agents, the money from the Vehicle sales flows directly back to Kia.

159.   As a result of its wrongful acts, concealments, and omissions regarding the Defect in its Vehicles, as set forth above, Kia charged higher prices for the Vehicles than the Vehicles' true value. Plaintiff and members of the class paid that higher price for their Vehicles to Kia's authorized distributors and dealers, which are in Kia's control.

160.   Additionally, as a direct and proximate result of Kia's failure to disclose the known Defect in the Vehicles, Plaintiff and Class members have Vehicles that will require high-cost repairs that can and therefore have conferred an unjust substantial benefit upon Kia.

161.   Kia has been unjustly enriched due to the known Defect in the Vehicles through the receipt and use of money paid for the defective vehicles, sale of replacement

parts, and performance of battery and electrical system repairs, that added to Kia's profits when said money should have remained with Plaintiff and the Class members.

162.    As a result of Kia's unjust enrichment, Plaintiff and the Class members have suffered damages.

163.    Equity and good conscience militate against allowing Kia to retain its ill-gotten gains, and requires disgorgement and restitution of the same.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the other members of the Class proposed in this Complaint, respectfully request that the Court enter judgment in their favor and against Defendant, as follows:

A.    Declaring that this action is a proper class action, certifying the proposed Class(es), designating Plaintiff Marc Brenman as Class Representative, and appointing the undersigned counsel as Class Counsel;

B.    Ordering Defendant to pay actual damages (and no less than the statutory minimum damages) and equitable monetary relief to Plaintiff and the other members of the Class;

C.    Ordering Defendant to pay statutory damages, as allowable by the statutes asserted herein, to Plaintiff and the other members of the Class;

D.    Awarding injunctive relief as permitted by law or equity, including enjoining Defendant from continuing the unlawful practices as set forth herein, and ordering Defendant to engage in a corrective recall campaign, free replacement program, a warranty extension, or other injunctive relief as deemed necessary;

E.    Equitable relief, including in the form of buyback of the Class Vehicles;

F.    Costs, restitution, damages, including punitive damages, penalties, and disgorgement in an amount to be determined at trial;

G.    Ordering Defendant to pay attorneys' fees and litigation costs;

H.    Ordering Defendant to pay both pre- and post-judgment interest on any amounts awarded; and

CLASS ACTION COMPLAINT

I.    Ordering such other and further relief as may be just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury of all claims in this Complaint so triable.

Dated:  June 3, 2026                              Respectfully submitted,


*/s/ Christopher E. Stiner*
Tina Wolfson (SBN 174806)
twolfson@ahdootwolfson.com
Robert R. Ahdoot (SBN 172098)
*rahdoot@ahdootwolfson.com*
Christopher E. Stiner (SBN 276033)
*cstiner@ahdootwolfson.com*
Lisa Cintron (SBN 356009)
*lcintron@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**
2600 W. Olive Ave., Suite 500
Burbank, CA 91505
(310) 474-9111 *(telephone)*
(310) 474-8585 *(facsimile*

Carter E. Greenbaum (SBN 344692)
carter@greenbaumolbrantz.com
**GREENBAUM OLBRANTZ LLP**
160 Newport Center Drive, Suite 110
Newport Beach, CA 92660
Tel: (332) 222-9119

*Counsel for Plaintiff and the Proposed Class*

39

CLASS ACTION COMPLAINT